UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY W. NORRIS,

        Plaintiff(s),        CASE NUMBER: 04-72048
                               HONORABLE VICTORIA A. ROBERTS

v.

STATE OF MICHIGAN DEPARTMENT
OF CORRECTIONS,

        Defendant(s).
_____/

OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.   INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment. The Court **GRANTS** Defendant's motion.

**II.   BACKGROUND**

Plaintiff Anthony Norris brings this action against his former employer, Defendant Michigan Department of Corrections ("MDOC"). Plaintiff alleges that he was terminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C, §12101, *et seq*.

Plaintiff was hired by Defendant as a Corrections Officer in May 1986. He was promoted to Resident Unit Officer in October 1987. In January 1995, Plaintiff transferred to the Huron Valley Men's Correctional Facility. He worked as the Grievance Coordinator. As such, he was responsible for reviewing grievances filed by prisoners, assigning investigators, and preparing responses at various stages of the

grievance process. He says the position required him to handle grievances of a sensitive nature that dealt with rights falling under the ADA.

Per Plaintiff, before he became the Grievance Coordinator, Huron Valley's handling of grievances was inadequate in a number of respects. He says that grievances were consistently lost, not processed or lacked proper responses. To resolve this problem, Plaintiff says that he implemented a followup process which held staff accountable for submitting proper responses. Plaintiff contends that many officers resented his persistent insistence that proper rules and procedures be followed with regard to grievances the officers considered frivolous. In fact, Plaintiff says that Deputy Warden Larry D. Ford told him that he should not process the grievances of certain prisoners.[1] One prisoner, Alan Hahn, was paralyzed. Hahn filed a number of grievances alleging violation of the ADA due to various forms of neglect by prison staff relative to his meals, housing conditions and health care.[2] Plaintiff says that staff failed to answer many of Hahn's grievances. When Plaintiff spoke with the captains[3] about lack of responses, he says they stated that Hahn was not entitled to the grievance

---

[1] Plaintiff says in his brief that Deputy Warden Ford spoke to him in a threatening manner and specifically told him not to process the grievance of prisoner Alan Hahn. Plaintiff implies that Ford's alleged threats related to Hahn's grievances. However, at the cited pages of Plaintiff's deposition, the threat he describes appears to be unrelated to the grievances, and Plaintiff does not make specific reference to Hahn. *See* Plaintiff Dep, June 4, 2005 at pp. 85-86. He just says that Ford told him not to process certain grievances.

[2] Per Plaintiff, Hahn specifically complained that his food was placed just out of his reach, staff refused to turn on the heat when it was cold, and that his bowel program was not administered in a timely fashion. Eighty such complaints were produced during discovery.

[3] "Captains" presumably were superior officers.

process because of the nature of his crimes.[4]  Plaintiff says Deputy Warden Ford made the same assertions.[5]  Four to eight weeks before Plaintiff was fired, the State Ombudsman visited the prison questioning the handling of Hahn's grievances.  Plaintiff testified that he demonstrated that he was processing the grievances but that the staff was not cooperating.  He said that the Ombudsman congratulated him on the work that he was doing and told him that she would get him some help "via" the Warden.[6]

On February 23, 1999, Plaintiff was assaulted by a prisoner.  He received worker's compensation and was off work for approximately six months.  Plaintiff attributes the assault, at least in part, to the fact that Deputy Warden Ford reassigned his office to a less secure area in a hallway across from the prisoners' restroom.

Events leading to Plaintiff's discharge occurred after he returned from leave.  Plaintiff reported to work on April 19, 2000 and went through the metal detector at the front gate.  He gave his briefcase to the gate officer, Denise Roberson.  During Officer Roberson's search of the briefcase, she found one marijuana cigarette.  An

---

[4]Hahn's crimes involved criminal sexual conduct.  However, the parties do not indicate the exact charges.

[5]Again, Plaintiff implies in his brief that Deputy Ford threatened him about the grievances.  He says that Ford warned him not to process them.  However, in his testimony he only says that Ford said that the grievances should not be processed because they were repetitive.  He does not indicate that Ford made direct or implicit threats.  *See* Plaintiff Dep., April 8, 2005, pp. 56-58.

[6]Plaintiff again overstates his testimony by asserting in his brief that he told the Ombudsman that the administrators were not responding to the grievances and, ultimately, that it was the Warden who was not insuring that the responses were provided in a timely fashion.  Pl. br. at p. 5.  In his deposition, however, he only indicates that he said that "staff" was not cooperating; he does not say that he specifically referenced the Warden.  *See* Plaintiff Dep., April 8, 2005, pp. 58-59.

investigation immediately ensued.  Plaintiff denied knowledge of the marijuana.  He also authorized a search of his person and car and submitted to a drug test.  No other drugs or evidence of drug use was found.

Warden Andrew Jackson assigned Inspector David Prough to investigate the incident and a disciplinary conference was held.  At the conclusion of Inspector Prough's investigation, he prepared a report and gave it to Warden Jackson.  Based on Prough's investigation and the information reported to him from the conference, on September 18, 2000, Warden Jackson recommended that Plaintiff be fired.  The recommendation was accepted by MDOC's Regional Director, Denise Quarles, and the MDOC Director's Office.  On October 6, 2000, Plaintiff was fired by Marsha Foresman, Special Assistant to the Director.  Ms. Foresman says that Plaintiff's termination was consistent with the MDOC disciplinary grid and that his conduct violated a number of MDOC work rules: 1) conduct unbecoming an MDOC employee; 2) failure to enforce or follow rules, regulations, policies or procedures; 3) possession of a controlled substance; and 4) introduction of contraband into a MDOC facility.

Plaintiff believes that he was "set up" by one or more officers who were upset with his handling of grievances.  He points out that the marijuana was found in an outside side pocket of his briefcase that was readily accessible to others.  And, he draws attention to three individuals who were involved in the disciplinary proceedings against him with whom he was also at odds regarding his processing of grievances--Karen Whalen, Captain Squires, and Daryl Monday.

Ms. Whalen was the Warden's Administrative Assistant.  Plaintiff says that he often complained to the Warden about Whalen's late responses.  It appears that

Whalen participated in Plaintiff's disciplinary conference and, at its conclusion, recommended to the Warden that Plaintiff be discharged. *See* Def. Exh. 4.

Captain Squires was at the scene of the incident and handled the marijuana cigarette. Plaintiff implies that Captain Squires deliberately mishandled the cigarette by holding it in his sweaty hand for an extended period in order to make reliable DNA testing impossible. Captain Squires' alleged motive for doing so was the fact that, a few weeks prior, Plaintiff complained to Captain Squires and his (Squires') supervisor, Deputy Warden Ford, about late responses to grievances by Hahn. Plaintiff says that Captain Squires said that the grievances should be rejected because of Hahn's crimes and because they were repetitive.

Finally, Daryl Monday was a Resident Unit Manager ("RUM"). Per Plaintiff, Monday made the same complaints as Captain Squires about Plaintiff's processing of Hahn's grievances. And, one day prior to the incident at the gate, Plaintiff says that Monday threatened to "get" Plaintiff once he (Monday) became Deputy Warden. On the day of the incident, Monday was near the entrance and allegedly witnessed the retrieval of the contraband from Plaintiff's briefcase. He served as a witness against Plaintiff during the disciplinary proceedings. Plaintiff regards Monday's presence in the area at the time as suspicious. Monday was in a secure area near the entrance--the "shakedown room"--handling drug paraphernalia unrelated to this incident. However, Plaintiff attaches the affidavit of Michael Andrews, then President of the Michigan Correction Officers Union, who says that the area Monday was in was inappropriate for handling drug paraphernalia found inside the prison, and that it was unprecedented for such activity to take place in that area.

5

In addition to the conspiracy Plaintiff believes was orchestrated against him, he also says that a similarly situated employee was not discharged. Mr. Andrews states that in 1999 a bag of marijuana was found in the coat pocket of Barbara Coleman, a Forensic Security Aide, when she attempted to enter the front gate of the Huron Valley Center. The Huron Valley Center is on the same grounds as the Huron Valley Mens Correctional Facility where Plaintiff worked (but in a different building), and exclusively houses MDOC prisoners. Per Mr. Andrews, Ms. Coleman claimed that the marijuana was left by her sister and that she was unaware of it. Thereafter, she was disciplined, but not terminated. Even though Ms. Coleman was employed by the Department of Mental (or Community) Health, not the MDOC, Andrews says that Coleman was covered by the same union as Plaintiff, worked under the same collective bargaining agreement, and had the same obligations as a corrections officer with regard to security and contraband. Ms. Foresman says, however, that Ms. Coleman was not subject to the same rules or disciplinary grid, and that the decision makers in Plaintiff's case would not have been involved in Ms. Coleman's case.

Plaintiff contends that the fact that he and Ms. Coleman were employed by different state agencies is an insignificant distinction between them, inasmuch as Ms. Coleman was allowed to transfer into the MDOC as a corrections officer at the Huron Valley Women's Correctional Facility after she was found with the marijuana and after he was fired. Plaintiff attributes the differences in their treatment to retaliation against him for his vigorous pursuit of prisoner grievances under the ADA.

Plaintiff points out that the Washtenaw County Prosecutor's Office declined to prosecute because it could not prove that he knew about the marijuana. Plaintiff also

says that his employment record prior to this time was unblemished.

Plaintiff first filed suit in the Washtenaw County Circuit Court in April 2002. He filed a two-count complaint alleging gender discrimination in violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. §37.2101, *et seq.*, and retaliation in violation of ELCRA ad the Michigan Persons with Disabilities Act, M.C.L. §37.1101, *et seq.* Washtenaw County Circuit Court Judge Melinda Morris dismissed both counts with prejudice, but granted Plaintiff's motion to file an amended complaint, which was removed to this Court. In the Amended Complaint, Plaintiff alleges one count of retaliation in violation of the ADA. Defendant contends that Plaintiff has failed to establish even a *prima facie* case and requests summary judgment.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

**IV.   APPLICABLE LAW AND ANALYSIS**

The ADA prohibits an employer from taking retaliatory action against an employee who opposes, or participates in inquiries related to, alleged violations of the Act:

>   (a) Retaliation

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. §12203. Plaintiff does not clearly indicate whether his claim is brought under the "opposition" clause or the "participation" clause. However, for the reasons stated below, he has not stated a *prima facie* claim under either theory.

The same elements used to establish a *prima facie* case of retaliation under Title VII of the Civil Rights Act, 42 U.S.C. §2000e, *et seq.,* apply to retaliation claims brought under either clause of the ADA: 1) that Plaintiff engaged in protected activity; 2) that the exercise of the Plaintiff's rights was known to Defendant; 3) that Plaintiff thereafter suffered an adverse employment action; and 4) that there was a causal connection between the protected activity and the adverse action. *Canitia v Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir. 1990); *DiCarlo v Potter,* 358 F.3d 408, 420 (6th Cir. 2004); *Penny v United States Parcel Service*, 128 F.3d 408, 417 (6th Cir. 1997).[7]

---

[7] Note that there is some inconsistency within the Circuit regarding the elements for an ADA retaliation claim. The Sixth Circuit indicates that it applies the same elements as apply to Title VII retaliation claims. *Penny*, 128 F.3d at 417. However, in published opinions the Sixth Circuit actually only lists three of the four elements used for Title VII retaliation claims, omitting the requirement that the Defendant knew about the employee's exercise of rights. *Id*; *Sullivan v River Valley School Dist.,* 197 F.3d 804 (6th Cir. 1999). But, in recent unpublished opinions it applies the four-factor test set forth herein. *See McElroy v Phillips Medical Sys. North America, Inc.,* 127 Fed. Appx. 161, 170 (6th Cir. 2005); *Kuriatnyk v Township of Bazetta, Ohio,* 93 Fed. Appx. 683, 686 (6th Cir. 2004). Other Courts within the Circuit, likewise, apply the four-factor test, as do the parties in this case. *See Roubal v Reynolds,* 2000 W.L. 791762, *10 (E.D. Mich. 2000); *Bukta v JCPenney Co., Inc.,* 359 F.Supp. 2d 649, 671 (N.D. Ohio 2004); *Adams v TRW Automotive US, LLC,* 2005 W.L. 1862302, *20 (M.D. Tenn. 2005). Because the Sixth Circuit's stated intention in published opinions is to apply the test used in Title VII claims, which includes four factors, and the parties rely upon the same test, the Court

9

In the absence of direct evidence of discrimination, the *McDonnell Douglas*[8] burden shifting approach applies to such claims. *Canitia,* 903 F.2d at 1066. That is, once plaintiff has proven a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id*. Once defendant meets its burden, plaintiff must show that the purported legitimate, nondiscriminatory reason was merely a pretext for discrimination. *Id*.

With regard to the first element, Plaintiff contends that his efforts to ensure appropriate processing of grievances, many or all of which were brought under the ADA, was protected activity. Defendant disputes this claim, arguing that Plaintiff's work did not qualify as protected activity because he handled the grievances in the course of his duties as the Grievance Coordinator.

There is support for Plaintiff's claim. In *Johnson v University of Cincinnati,* 215 F.3d 561 (6th Cir. 2000), the court found that the plaintiff's advocacy on behalf of other members of a protected class, even though it was in the course of his employment, entitled the plaintiff to protected status. Plaintiff, an African American, was the Vice President of Human Resources and Human Relations for the University of Cincinnati. His primary job responsibility was management of the University's affirmative action program. Throughout his tenure, plaintiff frequently questioned the University's commitment to affirmative action and criticized decisions that he believed were contrary to the University's claimed goals in that regard. Plaintiff was eventually fired and filed a

---

will apply the four-factor test in its analysis.

[8]*McDonnell Douglas Corp v Green*, 411 US 792 (1973).

10

complaint under Title VII and 42 U.S.C. §1981 alleging that he was discriminated against because, *inter alia*, of his advocacy on behalf of women and minorities (other than himself). The district court granted summary judgment to defendants finding that plaintiff was not engaged in protected activity. The court held that plaintiff's advocacy on behalf of women and minorities was part of his job and, therefore, was not protected activity.

On appeal, the *Johnson* Court disagreed. The Court stated that the district court's ruling was based on the erroneous assumption that, in order to have standing to sue under Title VII or §1981, a high-level affirmative action official must be a member of a protected group and allege discrimination against himself because of his membership in the group. The *Johnson* Court found that this assumption was contrary to the expressed congressional intent behind Title VII and §1981 as well as relevant case law. Therefore, the Court stated that "the fact that Plaintiff has not alleged discrimination because of *his* race is of no moment inasmuch as it was a racial situation in which Plaintiff became involved--Plaintiff's advocacy on behalf of women and minorities in relation to Defendant's alleged discriminatory hiring practices--that resulted in Plaintiff's discharge from employment." 215 F.3d at 575. The Court said that the race of the minorities for whom an official was advocating would effectively be "imputed" to the official. *Id.*

Plaintiff's claim in this case is analogous to the claim made by the *Johnson* plaintiff. Plaintiff claims that the real reason that he was fired was because of his aggressive insistence that officials comply with grievance procedures in order to address claims brought by inmates--particularly one disabled inmate who made

11

numerous claims that his ADA rights were violated. Under the authority of *Johnson*, the fact that Plaintiff advocated on behalf of inmates as part of his job is irrelevant. The protected status of the persons for whom he was advocating, which included at least one disabled person, was imputed to Plaintiff. Therefore, Plaintiff has presented sufficient evidence that he was engaged in protected activity. The first element is satisfied.

Plaintiff's testimony that he often complained to the Warden and other supervisors about the lack of appropriate or timely responses to grievances is sufficient to establish that Defendant knew of Plaintiff's protected activity. The second element is met.

Plaintiff was fired. This is indisputably an adverse action. *Kocsis v Multi-Care Management, Inc.,* 97 F.3d 876, 886 (6th Cir. 1996). The third element is met.[9]

However, Plaintiff's claim fails on the fourth element. "'A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation.'" *Nguyen v City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)(*quoting Parnell v West,* 114 F.3d 1188, *2 (6th Cir. 1997)(unpub. op.)). "[N]o one factor is dispositive in establishing a causal connection." *Id* at 563.

Here, Plaintiff presents no evidence on which reasonable jurors could base a finding that there is a causal connection between his work with grievances and his

---

[9]Assuming that Plaintiff would assert that the moving of his desk was an adverse action, Defendant argues that such a claim is barred by the statute of limitations. Since Plaintiff actually only asserts that his termination was an adverse employment action, it is not necessary for the Court to address Defendant's argument.

termination. Plaintiff makes several assertions that he believes establishes causation: 1) contrary to Defendant's assertion that the administrator who fired him, Marsha Foresman, did not even know about Plaintiff's protected activity, Plaintiff argues that his supervisors actually made the decision to fire him, and that the administrators at the regional level merely "rubber-stamped" the decision; 2) he contends that a similarly situated employee was not fired; 3) he contends that there is strong evidence that he was "set up;" and 4) he points out that the disciplinary grid allows for discipline less than termination.

With regard to Plaintiff's first assertion, it is not clear to which "supervisors" Plaintiff is referring. However, the evidence indicates that the only two people with whom Plaintiff worked directly who were involved in his termination decision were Warden Jackson and Jackson's assistant Karen Whalen. Plaintiff does not offer any evidence that Warden Jackson ever said or did anything that suggested he was displeased with Plaintiff's handling of grievances. In fact, Plaintiff testified that he and Warden Jackson had good communication regarding grievances. Def. Dep., June 4, 2005 at p. 173. And, although Plaintiff claims that he often complained to the Warden about Ms. Whalen's late responses, Plaintiff does not offer any direct evidence that her recommendation was made in retaliation for his complaints against her. Nor has he offered any evidence regarding when he made these complaints relative to when he was fired. Therefore, there is no basis to infer causation from the timing of his complaints and her recommendation.

Moreover, it is undisputed that the ultimate decision to fire Plaintiff was made by the MDOC Director's Special Assistant, Marsha Foresman. Contrary to Plaintiff's claim,

13

there is no evidence that either Ms. Foresman or the Regional Director who also recommended Plaintiff's termination, Denise Quarles, simply "rubber-stamped" the Warden and Whalen's recommendation. Nor is there any evidence suggesting that Foresman's decision was retaliatory. She stated in her affidavit that she did not know about Plaintiff's involvement in any civil rights claims or grievances when he was fired. Her claims are unrefuted.

Plaintiff's second assertion is that a similarly situated employee, Barbara Coleman, was not fired. Evidence that an employer treated an employee differently from similarly situated employees is relevant to the question of causation. *Nguyen*, 229 F.3d at 563. The unrefuted evidence indicates, however, that Ms. Coleman was not similarly situated. "[T]o be deemed 'similarly-situated', [sic] the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992).

It is undisputed that Ms. Coleman was not employed by the MDOC at the time of her incident. Additionally, there is no evidence to refute Ms. Foresman's assertion in her affidavit that Ms. Coleman also was not subject to the same work rules or disciplinary grid, and that none of the individuals involved in the decision to fire Plaintiff would have been involved in determining the discipline to be imposed on Ms. Coleman. The fact that Ms. Coleman was covered by the same collective bargaining agreement, held a parallel position with the Department of Mental (or Community) Health, and was

subsequently hired by the MDOC is not sufficient to overcome the fact that she was employed by a different entity and that different decisionmakers decided her discipline.

Plaintiff's third assertion is that he was "set up." In support, Plaintiff points to three individuals who allegedly had a motive--Ms. Whalen, Captain Squires and RUM Daryl Monday. There is no evidence to support Plaintiff's suspicions or a causal link to his termination. For the reasons already stated, there is no direct or circumstantial evidence that Ms. Whalen's recommendation that Plaintiff be fired at the conclusion of the disciplinary conference was in retaliation for his prior complaints against her. Plaintiff claims that Captain Squires deliberately spoiled evidence to preclude investigators from extracting evidence that would have cleared him. However, there is no evidence that Captain Squires' handling of the contraband, in fact, spoiled evidence. And, the fact that RUM Monday was present when the contraband was found under allegedly unprecedented conditions does not create an inference of causation absent any evidence that he did or could have planted the alleged contraband and/or gave a false statement regarding what he witnessed. The alleged contraband was allegedly recovered by officer Denise Roberson with Monday looking on. Plaintiff does not assert or present any evidence that Roberson either participated in planting the evidence or gave false statements about where it was found. In short, Plaintiff's claim that he was set up is based almost entirely on speculation, which is insufficient to establish causation.

Lastly, Defendant is correct that the disciplinary grid allows for a lesser discipline. However, there is no basis for reasonable jurors to rely on this fact alone as evidence that Plaintiff was fired because of his work with grievances. And, for the reasons stated

15

there is no factual support for the balance of Plaintiff's claims. Consequently, Plaintiff has failed to establish the final element necessary to state a *prima facie* claim.

Even if Plaintiff stated a *prima facie* claim, he has not shown that Defendant's claimed legitimate, nondiscriminatory reason for firing him--possession of marijuana--was mere pretext. A plaintiff can establish pretext by showing: "(1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the actions, or (3) that the proffered reason was insufficient to motivate the actions." *Hopkins v Electronic Data Systems Corporation,* 196 F.3d 655, 662 (6th Cir. 1999); *Kocsis,* 97 F.3d at 883; *Manzer v Diamond Shamrock Chems Company,* 29 F.3d 1078, 1084 (6th Cir. 1994).[10] The third element requires "evidence that other employees, particularly employees not in the protected class, were not fired even though they

---

[10] As with the elements for an ADA retaliation claim, there is an inconsistency within the Circuit regarding the proof required to establish pretext. As indicated above, the Sixth Circuit states in *Manzer, Kocsis and Hopkins* that a plaintiff may establish pretext by one of the three listed means. A later panel of the Sixth Circuit, however, seems to require a Plaintiff to prove all three elements to establish pretext. *See Johnson*, 215 F.3d at 573. However, the case *Johnson* relies upon, *Wheeler v McKinley Enters*, 937 F.2d 1158, 1162 (6th Cir. 19991), does not clearly require proof of all three elements. Although *Wheeler* uses the "and" conjunction in listing the means by which pretext can be proven, its analysis is more consistent with *Manzer, Kocsis and Hopkins*, and it cites an opinion that is in line with those cases as well, *Chappell v GTE Products Corp.*, 803 F.2d 261,266 (6th Cir. 1986). But, in unpublished opinions, the Sixth Circuit intermittently cites both tests. *See Young v Sabbatine*, 238 F.3d 426, *4 (6th Cir. 2000)(same as *Johnson*); *Coulter v Deloitte Consulting, L.L.C.,* 79 Fed. Appx. 864, 867 (6th Cir. 2003)(citing *Johnson*); *Faison v Mahoning County Sheriff's Dept.,* 139 Fed. Appx. 708, 712 (6th Cir. 2005)(citing *Manzer*); *Schuch v Savair, Inc.*, 118 Fed. Appx. 16, 23 (6th Cir. 2004)(applying *Manzer* test, but citing *Johnson*).

Because the earliest published opinion, *Chappelle,* applies the test as stated in *Manzer, Kocsis* and *Hopkins*, the Court will follow that line of cases. *See United States v Cooper*, 302 F.3d 592, 597 n.2 (6th cir 2002)("A panel of [the Sixth Circuit] may not reverse a prior published ruling of another panel; only an en banc panel of the court may do so.").

16

engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer,* 29 F.3d at 1084.

Plaintiff has not presented evidence of pretext by any of these means. He does not present any evidence that refutes Defendant's claim that marijuana was found in his bag. Plaintiff asserts that the real motive for firing him was his aggressive pursuit of grievances, rather than the marijuana. However, for the reasons stated, there is no support for such a claim. Lastly, Plaintiff failed to show that he was, indeed, similarly situated with the other employee who was not fired despite the fact that marijuana was also found to be in her possession.

For all of these reasons, Defendant's Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: December 15, 2005

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 15, 2005.

s/Linda Vertriest
Deputy Clerk